# United States Court of Appeals
## For the First Circuit

No. 21-1219

SAS INTERNATIONAL, LTD.,

Plaintiff, Appellant,

v.

GENERAL STAR INDEMNITY COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Thompson, Circuit Judges.

Eric E. Renner, with whom Renner Law, LLC was on brief, for appellant.

Benjamin C. Eggert, with whom Joseph W. Gross, Wiley Rein LLP, William P. Rose, and Melick & Porter, LLP were on brief, for appellee.

Robert J. Gilbert, with whom Margaret A. Upshaw and Latham & Watkins, LLP were on brief, for amici curiae Amphenol Corporation and Lawrence General Hospital.

Laura A. Foggan, with whom Crowell & Moring LLP, Kristin Suga Heres, and Zelle LLP were on brief, for amicus curiae American Property Casualty Insurance Association.

June 3, 2022

BARRON, **Chief Judge**.  SAS International, Ltd. ("SAS"), seeks coverage in this suit for losses that it claims to have suffered during the COVID-19 pandemic.  The defendant is its property insurer, General Star Indemnity Company ("General Star").  The United States District Court for the District of Massachusetts granted General Star's motion to dismiss SAS's complaint under Federal Rule of Civil Procedure 12(b)(6).  Applying Massachusetts law, we affirm based on the reasoning in the recent ruling by the Supreme Judicial Court of Massachusetts ("SJC") in Verveine Corp. v. Strathmore Insurance Co., 184 N.E.3d 1266 (Mass. 2022).

## I.

We "draw the facts from the complaint and its attachments."  Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 161 (1st Cir. 2020).  SAS owns and leases commercial property in Fall River, Massachusetts.  The World Health Organization declared on March 11, 2020, that the global outbreak of COVID-19 was a pandemic.

SAS's premises were, at the time, insured by General Star under a commercial property insurance policy effective September 16, 2019 to September 16, 2020 (the "Policy").  Twice during the summer of 2020, SAS submitted a claim under the Policy to General Star for its alleged pandemic-related losses pursuant to the Policy's "Building and Personal Property Coverage,"

- 3 -

"Business Income (and Extra Expense) Coverage," and "Civil Authority Coverage."

Under the Policy's "Building and Personal Property Coverage," General Star "will pay for direct physical loss of or damage to" the buildings that SAS owns "caused by or resulting from any Covered Cause of Loss," which "means direct physical loss." The Policy's "Business Income (and Extra Expense) Coverage" applies when SAS sustains "the actual loss of Business Income . . . due to the necessary 'suspension' of" SAS's "business activities," provided that "[t]he 'suspension' must be caused by direct physical loss of or damage to property." The Policy's "Civil Authority Coverage" applies when "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of" damages caused by a Covered Cause of Loss -- that is, by a "direct physical loss" -- and "[t]he action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage."

General Star denied the claim by SAS under the Policy. SAS then filed suit on September 11, 2020, in Massachusetts state court. General Star timely removed to the District of Massachusetts based on diversity jurisdiction. SAS filed an amended complaint, in which it alleged a breach of contract count based on the three coverage provisions described above. In doing

- 4 -

so, SAS sought a declaration from the court that the Policy covered its claims pursuant to those coverage provisions and that no exclusion in the Policy applied to bar or limit coverage for the claimed pandemic-related losses. General Star thereafter filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

The District Court granted General Star's motion to dismiss all of SAS's claims. SAS Int'l, Ltd. v. Gen. Star Indem. Co., 520 F. Supp. 3d 140, 141 (D. Mass. 2021). It held that SAS was not entitled to coverage under the Policy's Business Income and Extra Expense Coverage or Civil Authority Coverage for the claimed pandemic-related losses because SAS did not plausibly allege the "direct physical loss of or damage to" its insured property that the relevant coverage provisions of the Policy required SAS to show. Id. at 142, 145.

The District Court explained that those "terms require some enduring impact to the actual integrity of the property at issue," and the phrase "direct physical loss of or damage to property," taken as a whole, "does not encompass transient phenomena of no lasting effect." Id. at 143. The District Court determined that the word "physical" modifies both "loss" and "damage," and that each term, as modified, requires "tangible damage." Id. at 143-44. Applying this interpretation of the Policy, the District Court held that COVID-19 and SARS-CoV-2, the virus that causes it, were not Covered Causes of Loss, because the

virus "does not endure beyond a brief passage of time or a proper cleaning."  Id. at 144.  The District Court concluded that its interpretation was on all fours with Massachusetts law, a leading treatise, and cases around the country, including cases involving odors and gaseous contaminants.  Id. at 143-146.

"Having found that the phrase 'direct physical loss' does not encompass a viral infestation," the District Court concluded that the Policy's "Civil Authority Coverage" also did not "provide[] an avenue to relief [s]eparate and independent from the existence of direct physical loss of or damage to SAS's covered property."  Id. at 145 (internal quotation marks omitted) (second alteration in original).  That was so, the District Court explained, because that type of coverage, like the others, was "specifically limit[ed] . . . to a 'Covered Cause of Loss' -- namely, a 'direct physical loss.'"  Id.

SAS timely appealed.

## II.

SAS's appeal focuses solely on General Star's allegedly wrongful denial of coverage under the Policy's Business Income and Extra Expense Coverage.  "We review de novo an order dismissing a complaint for failure to state a claim, and we reverse the dismissal if 'the combined allegations, taken as true . . . state a plausible, not a merely conceivable, case for relief.'"  Lee v. Conagra Brands, Inc., 958 F.3d 70, 74 (1st Cir. 2020) (alteration

in original) (quoting Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2010)).

Allegations that are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc), will not be sufficient to meet that standard, and "conclusory legal allegations . . . need not be credited," Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015). "In undertaking this review, 'we accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor.'" Lanza, 953 F.3d at 162 (quoting Nystedt v. Nigro, 700 F.3d 25, 30 (1st Cir. 2012)).

Massachusetts law applies. Fidelity Coop. Bank v. Nova Cas. Co., 726 F.3d 31, 36 (1st Cir. 2013). It requires that we

> look to "the actual language of the policies, given its plain and ordinary meaning." The burden of demonstrating that an exclusion exists that precludes coverage is on the insurer, and "any ambiguities in the exclusion provision are strictly construed against [said] insurer." Where "the relevant policy provisions are plainly expressed, those provisions must be enforced according to their terms and interpreted in a manner consistent with what an objectively reasonable insured would expect to be covered."

Id. at 36–37 (alteration in original) (first quoting Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012); and then

quoting Vicor Corp. v. Vigilant Ins. Co., 674 F.3d 1, 11 (1st Cir. 2012)).

SAS contends that the District Court erred in granting the motion to dismiss on its claims pertaining to the Policy's Business Interruption and Extra Expense Coverage because it has plausibly alleged that the virus caused "direct physical loss of and damage to" covered property. Verveine requires, however, that we conclude otherwise.

That case concerned a suit in Massachusetts state court under Massachusetts law by the owners of three restaurants. The owners of the restaurants sought coverage under their property insurance policies for the "direct physical loss of or damage to" their property that they claimed to have suffered as a result of the COVID-19 pandemic. Verveine, 184 N.E.3d at 1269-70.

The SJC explained that "'direct physical loss of or damage to' property requires some 'distinct, demonstrable, physical alteration of the property[,]'" id. at 1275 (quoting 10A Steven Plitt et al., Couch on Insurance § 148:46 (3d ed. 2016)), and that "property has not experienced physical loss or damage in the first place unless there needs to be active repair or remediation measures to correct the claimed damage or the business must move to a new location," id. (citing Sandy Point Dental, P.C. v. Cincinnati Ins. Co., 20 F.4th 327, 333 (7th Cir. 2021)). The SJC further held that "[w]hile saturation, ingraining, or

- 8 -

infiltration of a substance into the materials of a building or persistent pollution of a premises requiring active remediation efforts is sufficient to constitute 'direct physical loss of or damage to property,'" "[e]vanescent presence of a harmful airborne substance that will quickly dissipate on its own, or surface-level contamination that can be removed by simple cleaning, does not physically alter or affect property," and, thus, "is not" likewise sufficient. Id. at 1276 (citing Kim-Chee LLC v. Phila. Indem. Ins. Co., 535 F. Supp. 3d 152, 160-61 (W.D.N.Y. 2021), aff'd, No. 21-1082, 2022 WL 258569 (2d Cir. Jan. 28, 2022)). Based on this construction of the phrase "direct physical loss of or damage to property," the SJC determined that "the suspension of business at the [plaintiffs'] restaurants was not in any way attributable to a direct physical effect on the plaintiffs' property that can be described as loss or damage," id., because the virus "will quickly dissipate on its own" or "be removed by simple cleaning," id.

Verveine did not adopt the "actual integrity" requirement on which the District Court partially relied. See id. at 1275. But, we may affirm the District Court on any ground manifest in the record, MacDonald v. Town of Eastham, 745 F.3d 8, 11 (1st Cir. 2014), and Verveine did clearly hold that an allegation of only the "evanescent presence" of the virus or a type of presence that could be addressed through simple cleaning required the legal conclusion that there was no "direct physical

- 9 -

loss of or damage to property" under the policies at issue in that case, 184 N.E.3d at 1276. Because the relevant policy language here is the same, and SAS's factual allegations allege no more than a presence of the virus that is evanescent or may be addressed through simple cleaning, Verveine's reasoning applies fully here.

SAS is right that its complaint alleges that "smaller aerosol droplets" carrying SARS-CoV-2 "can linger in the air for hours" and "can be pulled into air circulation systems and spread to other areas in a building." SAS is also right that its complaint alleges that "SARS-CoV-2 can linger" on surfaces "for up to 28 days, serving as a vehicle for viral transmission during that timespan." And, we note, the complaint at issue in Verveine did not contain such allegations. See Complaint at 4, Verveine v. Strathmore Ins. Co., No. 2084CV01378, 2020 WL 11590554 (Mass. Super. Ct. Dec. 21, 2020).

But, even if the presence of the virus on a surface for 28 days is too long to be deemed "evanescent," SAS makes no allegation that the virus cannot "be removed by simple cleaning," Verveine, 184 N.E.3d at 1276. SAS does argue that its complaint alleges that the virus is "ubiquitous," "omnipresent and . . . constantly reintroduced." It then goes on to contend, in that same vein, that it has alleged that the virus "cannot simply be removed with disinfectant because it is continually spread and reintroduced." But, even assuming that SAS has fairly

- 10 -

characterized its complaint, those allegations about the way that the virus can be spread by individuals entering the premises who are infected does not constitute an allegation that the virus, when present, will not "quickly dissipate on its own" within the meaning of Verveine or cannot be removed from surfaces "by simple cleaning," Verveine, 184 N.E.3d at 1276. Nor does such an allegation necessarily allege the sort of "persistent pollution of a premises requiring active remediation efforts," id., that could give rise to a "direct physical loss" under Verveine, given that the SJC, in contrasting "persistent pollution" with "evanescent presence," cited cases involving ammonia release, gasoline-infiltrated soil and vapors, and a persistent odor from a methamphetamine lab, all of which required remediation measures beyond simple cleaning and would not have naturally and "quickly dissipate[d]." Id. (citing Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am., No. 2:12-cv-04418, 2014 WL 6675934 (D.N.J. Nov. 25, 2014); W. Fire Ins. Co. v. First Presbyterian Church, 437 P.2d 52, 53-55 (Colo. 1968); Farmers Ins. Co. of Or. v. Trutanich, 858 P.2d 1332, 1335 (Or. Ct. App. 1993)).

SAS's amicus does attempt to distinguish Verveine by noting that the SJC there "favorably cited" the rule that "an imperceptible but dangerous substance in a building ([such as] carbon monoxide) constitutes 'direct physical loss or damage to property,'" (citing Matzner v. Seaco Ins. Co., No. CIV. A. 96-

- 11 -

0498-B, 1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998)), and the rule that "undamaged property . . . suffers 'direct physical loss' when rendered 'unusable and uninhabitable' by the risk of a physical peril.'" (quoting Murray v. State Farm Fire & Cas. Co., 509 S.E.2d 1, 17 (W. Va. 1998)). But, in doing so, the SJC in Verveine explained that the complaint in Verveine itself alleged that the virus at issue there concerned a substance alleged to have only an evanescent presence or to be subject to removal by simple cleaning, which was not true of the allegations in Matzner, given that those allegations involved losses that were claimed to have been caused by carbon monoxide that was present in consequence of a blocked chimney rather than discrete individuals entering the relevant premises without causing any "direct physical effect on property." 184 N.E.3d at 1275, 1276 (emphasis in original). Moreover, the SJC distinguished Murray in Verveine by explaining that the home in that case -- which was at risk of a rockfall and had been ordered evacuated by the fire department but was "not damaged" -- was "'unusable and uninhabitable'" because "no 'rational persons would be content to reside' in" it. Id. at 1277 n.15 (quoting Murray, 509 S.E.2d at 17). That ground of distinction is equally applicable here, given the nature of the allegations in SAS's complaint.[1]

---

[1] We note in this regard that SAS makes no allegation that it has suffered a complete dispossession of and thus a "direct

- 12 -

Finally, we are not persuaded by SAS's appeal to the canon that "[a]ny ambiguities in the language of an insurance contract . . . are interpreted against the insurer who used them and in favor of the insured," id. at 1272 (second alteration in original) (quoting Dorchester Mut. Ins. Co. v. Krusell, 150 N.E.3d 731, 738 (Mass. 2020)). Verveine cited that same canon and nonetheless reached the result that it did because it determined that there was no ambiguity as to whether the virus caused a "direct physical loss." See id. And while SAS does emphasize that the Policy contains no virus exclusion, Verveine concluded that the absence of such an exclusion there could not give rise to a "negative implication that policies that do not contain the exclusion should cover claims arising from the COVID-19 virus." Id. at 1277.

## III.

**Affirmed**. The parties shall bear their own costs.

---

physical loss of" its property. In fact, SAS alleges that "employees, customers, and mail, parcel and freight delivery drivers are frequently coming and going in and out of SAS's property."

- 13 -